### TEXAS CO. v. ALAMO CEMENT CO. (No. 5249.)

(Court of Civil Appeals of Texas. San Antonio. April 8, 1914. Rehearing Denied July 2, 1914.)

1. TRIAL (§ 365*)—SPECIAL INTERROGATORIES —CONSTRUCTION OF FINDINGS.

In an action for the price of fuel oil, in which defendant counterclaimed for a breach by plaintiff of a contract to furnish all the fuel oil required for six months, and the court submitted a question as to whether the oil shipped was shipped in recognition of a verbal agreement or to supply the immediate demands of defendant in the belief that it would execute a written contract, an answer, "One car on verbal contract, two cars on written contract," was not a finding that the last two cars were shipped in acceptance of a written contract never

executed by plaintiff, the question not calling for such an answer, and would be construed as meaning that they were shipped under the belief that defendant would execute a written contract.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 871–874; Dec. Dig. § 365.*]

**2. TRIAL (§ 350*)—SPECIAL INTERROGATORIES —ULTIMATE OR EVIDENTIARY FACTS.**

Where proof of a fact submitted, though evidentiary, is equivalent to proof of the ultimate fact and carries with it the same legal consequences, there is no objection to its submission.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 828–833; Dec. Dig. § 350.*]

**3. SALES (§ 53*)—ACTIONS—SUFFICIENCY OF EVIDENCE—ACCEPTANCE OF CONTRACT.**

In an action for the purchase price of fuel oil, in which defendant counterclaimed for breach of a contract to furnish all the oil required by it for six months, evidence *held* insufficient to make a question for the jury as to whether the seller accepted and acted upon a written agreement between the buyer and its agent to the effect alleged by ·defendant.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 145–151; Dec. Dig. § 53.*]

**4. SALES (§ 53*)—ACCEPTANCE OF CONTRACT— QUESTIONS FOR JURY.**

If the undisputed facts showed that contracts signed by a buyer were accepted by the seller and acted on as a binding contract, the court should have so held, as a matter of law, instead of submitting the question to the jury, as it is not the province of the jury to declare the law arising upon undisputed facts.

[Ed. Note.—For other cases, see ·Sales, Cent. Dig. §§ 145–151; Dec. Dig. § 53.*]

**5. LIMITATION OF ACTIONS (§ 127*)—COMPUTATION OF PERIOD—AMENDMENT OF PLEADINGS.**

In an action for the purchase price of fuel oil, defendant counterclaimed for breach of a contract to furnish all the oil required by defendant for six months, and alleged damages from such breach, amounting to the difference between the contract price and the market price of the oil. By an amended answer, filed more than two years after the breach of such alleged agreement, it alleged and sought to recovered damages sustained by shutting down its factory because of the failure of plaintiff to furnish oil. *Held*, that the claim for such damages was barred by limitations, since, while the courts are very liberal· in sustaining amendments as a mere continuation or ·amplification of the original suit, the original pleadings must disclose an intention to litigate the matter set up in the amendment, and no intention to plead such damages was disclosed by the original answer.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 543–547; Dec. Dig. § 127.*]

**6. SALES (§ 411*) — BREACH OF CONTRACT — SPECIAL DAMAGES — NECESSITY OF PLEADING.**

A buyer of fuel oil could not recover the wages of its employés and profits lost during the time it was compelled to close its factory by reason of the seller's failure to furnish the oil as agreed, without pleading such damages.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1161–1164; Dec. Dig. § 411.*]

**7. PRINCIPAL AND AGENT (§ 174*)—ACTS OF AGENT — RATIFICATION — QUESTIONS FOR JURY.**

In an action for the purchase price of fuel oil, in which defendant counterclaimed for breach of a contract to furnish all the oil required by defendant for six months, evidence *held* sufficient to justify the submission of a question as to whether plaintiff's agent, before the shipment of the oil sued for. communicated with and advised plaintiff that he had closed a verbal contract to furnish a car load of oil every third day for six months.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 725; Dec. Dig. § 174.*]

**8. APPEAL AND ERROR (§ 1062*)—TRIAL (§ 350*) — SPECIAL ISSUES — MATTERS TO BE SUBMITTED—HARMLESS ERROR.**

In such action the court should have submitted the issue whether plaintiff knew that its agent had made a verbal contract to furnish a car load of oil every third day for six months when the oil sued for was shipped, instead of submitting the issue whether the agent communicated such information to plaintiff; but any error in submitting the latter issue was harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4212–4218; Dec. Dig. § 1062;* Trial, Cent. Dig. §§ 828–833; Dec. Dig. § 350.*]

**9. APPEAL AND ERROR (§ 1170*)—HARMLESS ERROR—SUBMISSION OF ISSUES.**

The submission of an issue already covered· by another issue was not reversible error under rule 62a for Courts of ·Civil Appeals (149 S. W. x), forbidding reversals for errors at the trial unless the appellate court shall be of the opinion that the error amounted to such a denial of appellant's rights as was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4032, 4066, 4075, 4098, 4101, 4454, 4540–4545; Dec. Dig. § 1170.*]

**10. SALES (§ 52*)—ACTIONS FOR BREACH—SUFFICIENCY OF EVIDENCE.**

In an action for the purchase price of fuel oil, in which defendant counterclaimed for breach of a contract to furnish all the oil required by it for six months, evidence *held* to sustain a finding that defendant's president and plaintiff's agent both intended a verbal contract to that effect, made by them,·to be binding.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–144, 1045; Dec. Dig. § 52.*]

**11. PRINCIPAL AND AGENT (§ 173*)—ACTS OF AGENT — RATIFICATION — SUFFICIENCY OF EVIDENCE.**

In such action, evidence *held* to sustain a finding that the oil sued for was shipped in recognition of a verbal contract between defendant's president and plaintiff's agent to so furnish the oil required for six months.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 659–661; Dec. Dig. § 173.*]

**12. PRINCIPAL AND AGENT (§ 170*)—UNAUTHORIZED ACTS—RATIFICATION.**

Where a seller recognized a verbal contract by its agent for the sale of fuel oil, and shipped a part of the oil pursuant thereto, it was bound by the contract, whether the agent had authority to make the contract or not.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 638–643; Dec. Dig. § 170.*]

**13. JUDGMENT (§ 256*)—CONFORMITY TO SPECIAL FINDINGS.**

In an action for the purchase price of fuel oil, in which defendant counterclaimed for breach of a contract to furnish all the oil required by it for six months, it was not entitled to judgment for profits lost while its ·plant was closed for want of fuel oil, where the issues submitted did not call for sufficient information to determine the number of days the plant was

closed nor the amount of cement it would have produced during that time, and the jury found the market value of the cement without stating the quantity referred to, as the verdict could not be aided by reference to the evidence, and Sayles' Ann. Civ. St. 1897, art. 1331, providing that an issue not submitted and not requested shall be deemed as found by the court in such manner as to support the judgment, provided there be evidence to sustain such finding, had no application; the court having denied judgment for such lost profits.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 446–454; Dec. Dig. § 256.*]

Appeal from Bexar County Court for Civil Cases; T. J. Murray, Special Judge.

Action by the Texas Company against the Alamo Cement Company. From a judgment for defendant, plaintiff appeals. Reversed and rendered.

Don A. Bliss, of San Antonio, for appellant. M. J. Arnold, R. S. Cozby, and W. S. Peyton, all of San Antonio, for appellee.

MOURSUND, J. We adopt appellant's statement of the case: ·

"On June 4, 1912, appellant filed suit against appellee on a verified account, seeking to recover of appellee $336, the price of three car loads of fuel oil alleged to have been sold and delivered by appellant to appellee at the special instance and request of appellee, one car load on July 6th, one on July 9th, and one on July 12th, all in the year 1910.

"On June 19, 1912, appellee filed its original answer in the suit, consisting of a general demurrer and general denial.

"On July 2, 1912, appellee filed its first amended original answer, consisting of a general demurrer, a general denial, and a counterclaim. The special answer setting up the counterclaim alleged, in substance, that on or about July 1, 1910, appellant and appellee made a contract, by the terms of which appellant bound itself to furnish to appellee all the fuel oil that appellee would need for a period of six months beginning on July 6, 1910, free on board the cars at the Galveston, Harrisburg & San Antonio tracks in San Antonio, Texas, and appellee was to pay for said oil at the price of $1.05 per barrel; and that, in compliance with said contract, appellant delivered the said three car loads of oil; but that appellant refused to ship to appellee any more oil, and, by reason thereof, appellee was compelled to procure the balance of the oil it needed during said period of six months, 28 car loads, from other sources, at $1.09 per barrel, which price, appellee alleged, was the market price of oil per barrel during the remainder of said period in said city of San Antonio. Appellee attached to its said amended original answer an itemized statement showing the dates, quantities, and prices of oil purchased by it during the remainder of said period aggregating 4,741.20 barrels. Appellee alleged that it had been damaged by reason of the premises in the total sum of $237.06, and prayed that said amount be allowed to it as an offset and credit.

"On August 27, 1913, appellee filed its second amended original answer in the suit, which also consisted of a general demurrer, a general denial, and a special answer setting up a counterclaim. This counterclaim was substantially in most respects the same as that contained in its first amended original answer, but claimed that the quantity of oil it had been compelled to purchase from other sources during said period of six months was 30 car loads, aggregating 5,088.58 barrels, and averred its damages

to be the sum of $254.42; and said special answer contained additional allegations to the effect that, at the time the contract was made, appellee owned and operated a Portland cement factory; that in operating said plant it was necessary to have a car load of fuel oil every third day, or shut down the operation of the plant; and that, when the plant was shut down, the 'expenses of employed help would still have to be paid, as the employed help could not be laid off without entirely disorganizing the force and occasioning it greater loss'; all of which appellee alleged appellant was informed of and knew when the contract was made. Appellee alleged that it used due diligence to procure oil from other sources as soon as appellant refused to ship any more oil, but, notwithstanding this, appellee was compelled to shut down its plant for want of a supply of fuel oil for a period of eight days from July 17, 1910, until July 25, 1910, and it was compelled to pay its said employed help while they were thus idle the sum of $170.10; and appellee further alleged that it was making a profit of $50 a day operating its said plant when the same was thus shut down, and would have continued to· make said profit during said eight days had appellant furnished it oil as it had bound itself to do. Appellee sought to recover of appellant all of said alleged damages aggregating $854.52.

"Appellant, in reply to the second amended original answer of appellee, filed its first supplemental petition on September 11, 1910, specifically denying that any such contract as that alleged by appellee had ever been made by the parties; pleading the statute of limitations of two years in bar; specifically denying that appellee had ever suffered the special damages alleged by it; and pleading the statute of limitations of two years in bar of said special damages.

"Appellee, on September 13, 1913, filed its first supplemental answer, specifically denying that its said counterclaims were barred by the statute of limitations.

"A verdict was rendered by the jury on special issues submitted by the court; and, on October 25, 1913, a judgment was rendered by the court on this verdict awarding to appellee a recovery against appellant of the net sum of $43.92, with interest from that date at the rate of 6 per cent. per annum ·and all costs."

[1, 2] By the first assignment of error appellant contends that the item of $170, allowed appellee as damages caused by having to pay salaries of employés during the time the cement works were shut down on account of having no fuel oil, was barred by limitation. To this contention appellee answers that the contract breached by appellant was a written contract. It does not appear that the question was submitted to the jury whether a written contract was entered into by the parties. Appellee, it seems, did not feel that such question could result in any benefit, because no request was made for its submission. However, the following question was submitted:

Question 5: "After the written instrument, dated July 5, 1910, was signed by the Alamo Cement Company, was such written instrument accepted and acted on as a binding written agreement by the Texas Company?"

This was answered, "Yes."

Question No. 5, requested by appellant, was also submitted, reading as follows:

"The undisputed evidence shows that the Texas Company shipped to the Alamo Cement

Company three car loads of fuel oil. Were these car loads of fuel oil shipped by the Texas Company to the Alamo Cement Company in recognition of the verbal agreement, if any, or were they shipped to supply the immediate demands of the Alamo Cement Company in the belief upon the part of the Texas Company that the Alamo Cement Company would execute a written contract?"

This was answered: "One car on verbal contract; two cars on written contract."

This answer cannot be taken as a finding that the last two cars were shipped in acceptance of the written contract. The question did not call for any such answer, and, construing the answer in connection with the question, it must be found that the jury decided that one car was shipped in recognition of a verbal contract, and two in the belief that the Alamo Cement Company would execute a written contract. The question first stated, however, directly presents the question whether the written instrument was accepted and acted upon by appellee as a binding contract, and appellee contends that the affirmative answer thereto is equivalent in law to a finding that a written contract was made. Appellant excepted to this issue on several grounds, one of which is that the same does not submit the ultimate fact whether a written contract was made, but merely an evidentiary fact. If the proof of the fact submitted is equivalent to proof of the ultimate fact—in other words, carries with it the same legal consequences—we see no objection to submitting it directly, instead of submitting the issue, whether a written contract was entered into, and instructing the jury that if a written contract signed by one party is acted upon and accepted by the other, such other is bound thereby as a written contract the same as if it had attached its signature thereto.

[3, 4] Another objection is that it submits to the jury a question of law arising upon facts that are shown by the undisputed testimony. Galbraith, appellant's agent at San Antonio, conducted the negotiations with Baumberger, who was president of appellee company. Galbraith had no authority to sign any written contract or to change or accept any written contract. Dodge was manager of appellant's sales department, having his office at Houston. He was the only person who had authority to execute, change, or accept written contracts on behalf of appellant relating to sales of fuel oil. After various negotiations had taken place between Galbraith, representing appellant, and Baumberger, representing appellee, on July 5th, Galbraith wired appellant at Houston, as follows:

"Closed with Baumberger. See letter date. Ship rush one car one hundred and fifty barrels Sunset as per letter first. Follow with small car every third day to fill contract until further advice. Ship open, references satisfactory, lubricants lined up. Hurry contract for signature as per letter."

On same day Galbraith wrote appellant at considerable length, stating, among other things, that Baumberger wanted contract made out to cover fourth paragraph of Galbraith's letter to Dodge, of July 1st, which paragraph contained the following sentence:

"Plant is also off the railroad and account of hauling and conditions shipments must be made in 155-barrel cars via G., H. & S. A."

In said letter of July 5th Galbraith requested that contracts be forwarded for signature as promptly as possible. On July 6th Dodge, pursuant to Galbraith's request, issued an order to the traffic department for small cars of oil to be shipped to appellee at intervals of three days until further notice. These cars were shipped on July 6th, 9th, and 10th, as shown by the bills of lading, and bills of even date accompanying the bills of lading were sent to appellee. The bill of lading and bill for the first car were mailed from Houston on July 8th, and bills of lading and bills for the other two cars were mailed on July 12th. We have found no testimony showing from which one of the shipping points of appellant these cars were sent, but, judging by the discrepancy between the dates when bills of lading were mailed out of the Houston office and their dates, it seems that said bills of lading were sent from one of the shipping points to the main office, and from there mailed to appellee. On July 7th, Dodge sent Galbraith copies of written contract for appellee's signature. On July 8th, they were presented to Baumberger by Galbraith, and Baumberger refused to sign them until he and Galbraith had added two clauses, one of which was as follows:

"(8) Shipments to be made in small cars of 155 to 160 barrels whenever possible and to be routed for San Antonio delivery via the G., H. & 'S. A. Railway."

Galbraith had no authority to change such contracts and they were therefore returned to Dodge at Houston, he receiving them on July 9th. He refused to accept them, and drafted new contracts, changing said eighth clause so as to make it read:

"Shipments to be made in small cars of 155 to 160 barrels whenever possible."

These contracts, together with Baumberger's signature to the other contracts, were mailed to Galbraith with letter dated July 9th, wherein he was told that appellant could not agree to the clause limiting shipments to the Galveston, Harrisburg & San Antonio Railway Company's lines. This letter was received by Galbraith on July 12th, and he replied the same day, stating that he had called on Baumberger and given him his signatures to the other contracts and presented the new ones; that Baumberger refused to sign, again insisting that the clause with reference to shipments being over Galveston, Harrisburg & San Antonio Railway lines should be retained in the contracts. On the same day Galbraith also sent a night letter to the same effect. On the 13th negotiations

were declared off, appellant notifying appellee that no contract existed between them, and appellee notifying appellant that they would hold appellant for all damages they might suffer on account of failure of appellant to comply with what appellee contended was a contract. Baumberger testified that after signing the contracts he did not see Galbraith until the morning of July 13th, when Galbraith called and stated, "I was authorized to close the contract, and now I am authorized to cancel it; here is your signature to that piece of paper I brought around the other day;" that Galbraith never presented to him any other contracts, and he had not seen any others until the trial took place; that Galbraith never told him that appellant was willing to agree to all the stipulations except the one requiring shipments to be over the Galveston, Harrisburg & San Antonio Railway. Baumberger admitted that the contracts presented to him for signature were not signed by appellant; that Galbraith did not tell him the contracts would have to be submitted to the Houston office for approval after Galbraith added the clauses 8 and 9. This testimony was later modified by admitting that he did not recollect what was said after he signed the contracts, and that before he signed them Galbraith told him the Houston office wanted the contract in writing. As Galbraith took both contracts away with him, Baumberger is bound to have understood that Galbraith had no authority to change and sign them, or he would have done so, leaving one copy with Baumberger. The only dispute relates to what was said and done by Galbraith. The facts are undisputed as to what Dodge did. He was the only man authorized to accept or make a written contract. If, as a matter of law, his actions, or those of others done by his authority, show that the contracts signed by Baumberger were accepted and acted on as a binding contract, the court should have so held, as it is not the province of the jury to declare the law arising upon undisputed facts. Laufer v. Powell, 30 Tex. Civ. App. 604–612, 71 S. W. 549. If such is the conclusion of law necessarily deduced, no harm was done by the jury arriving at such conclusion, but after careful consideration we conclude that the evidence is wholly insufficient to show any such acceptance or acting with reference to the contracts signed by Baumberger as would make the same binding upon appellant. We find no evidence that Dodge ever accepted the contracts signed by appellee. He promptly refused to accept same. We also fail to find any facts justifying a finding that any oil was shipped upon the contracts signed by appellee. The oil was ordered shipped two days before appellee signed the contracts, and the failure of appellant to stop the shipments furnishes no inference of an acceptance of the contracts signed by Baumberger. Dodge rejected the contracts and mailed a compromise contract, but did not stop the cars. It had been represented all along by Galbraith that appellee's need of a car every three days was pressing, and in the letter containing the contracts signed by appellee the necessity of sending out those three cars was again mentioned in such a manner as to show that Baumberger was anxious to secure the same. We do not see how appellant could be deprived of any rights by letting the three cars go forward while the negotiations were still pending, nor how it can be plausibly contended that failure to stop the cars shipped on the 9th and 10th constituted any acceptance of or acting upon the contracts rejected on the 9th. Appellee does not contend that Galbraith's taking the contracts for the purpose of sending them to Houston for signature constituted an acceptance thereof, nor could such contention be sustained if made. We therefore hold that there is no evidence upon which appellant can be held to be bound by a written contract. Appellee contends that appellant requested the submission of this issue in its fifth requested issue, and is therefore estopped from complaining. Said question 5 has been hereinbefore quoted, and an examination thereof discloses that it only required a finding whether the three cars of oil were shipped in recognition of a verbal agreement or to supply the immediate demands of appellee in the belief upon appellant's part that appellee would execute a written contract. It is clear that this issue is entirely different from the one submitted at appellee's request. Appellant was merely seeking a specific finding as to whether any verbal contract had been recognized by it, or whether the cars were not shipped upon any such contract, but merely in the expectation that the parties would execute a written contract.

[5, 6] It becomes necessary to determine whether the amount allowed as damages for salaries paid to employés during a shutdown of the cement factory is barred by limitation. It will be noticed from a statement of the pleadings that more than two years had elapsed from the breach of the verbal contract before the second amended original answer was filed, in which appellee pleaded for the first time the facts relied upon to show that appellant had such notice as would charge it with such special damages. The question then arises whether this amendment set up a new or additional cause of action. Upon this point we find no authority directly in point, and find so much confusion in the decisions relating to the general subject as to make it difficult to determine when a new cause of action is pleaded. Our courts have, in recent years, become very liberal in sustaining amendments as a mere continuation or amplification of the original suit. But the original pleadings must disclose an intention to litigate the matters set

up in the amendment, in order for such amendment to be regarded as a continuation of the suit. Townes' Texas Pleading (2d Ed.) p. 457. It is also well settled that an amplification of the prayer for relief, based upon the facts alleged in the first pleading, does not constitute the allegation of a new cause of action. Railway v. Pape, 73 Tex. 502, 11 S. W. 526; Railway v. Richards, 11 Tex. Civ. App. 107, 32 S. W. 96. In this case facts are alleged in the amended pleading which constitute the basis for special damages. Such facts enter into the contract and materially change the rights and liabilities of the parties. Unless they are pleaded and proved, special damages cannot be recovered. No intention is disclosed to plead such facts or such damages in the first amended petition filed in this case. It appears that the same evidence would not support both of the pleadings in this case, the measure of damages is different, and the allegations of the amended pleading, are subject to defenses as to the special facts alleged and the obligations arising therefrom, which are not applicable to the allegations of the first amended original answer. We conclude that under the rules laid down in Lumber Co. v. Water Co., 94 Tex. 462, 61 S. W. 707, the cause of action set up in the second amended original answer was a new cause of action, and barred by limitation. Lee v. Boutwell, 44 Tex. 151; Railway v. Bracht, 157 S. W. 270; Whalen v. Gordon, 95 Fed. 305, 37 C. C. A. 70; Townes' Texas Pleading (2d Ed.) pp. 454 to 457; Fairbanks v. Smith, 99 S. W. 705; Ft. Smith v. Fairbanks, 101 Tex. 24, 102 S. W. 908.

Assignments of error Nos. 1 and 4 are sustained. Assignments 2, 3, and 5 are overruled.

[7, 8] By the sixth assignment appellant complains of the submission of question No. 3, requested by appellee, reading as follows:

"Did R. C. Galbraith, before the Texas Company shipped any oil to the Alamo Cement Company, communicate with the Texas Company, and in such communication, if any, say that he had, for the Texas Company, closed a verbal contract with the Alamo Cement Company to the effect that the Texas Company should, for $1.05 a barrel, ship to the Alamo Cement Company one small car of fuel oil every third day during a period of six months following July 5, 1910, the shipments to be routed Galveston, Harrisburg & San Antonio delivery?"

This question was objected to on two grounds, only one of which is urged in the proposition submitted under the assignment, namely, that, the communications referred to being by a certain telegram and letter, the evidence was undisputed as to what was communicated after the verbal contract was made, and therefore the court should not have submitted the issue. It appears there was a telephone conversation between Galbraith and Straughan on July 5th, in which Straughan was told that Baumberger wanted to close a contract that day. On the 6th, as shown by letter from Galbraith to Straughan, of that date, another telephone conversation occurred. No one testified what was said in this conversation, but it was concerning the deal with Baumberger, as shown by the letter. Whether it occurred before or after shipment was ordered made on July 6th does not appear. Most likely it occurred before, as it was probably thought necessary to a full understanding of the situation. Dodge makes certain statements in his testimony indicating that he knew Galbraith had made a contract, which statements will be commented upon more fully in considering the question whether the shipment was made in recognition of the verbal contract. We are not prepared to say there was no evidence to go to a jury on the issue whether Galbraith communicated to appellant the making of a verbal contract, but agree that, if the only communications were in writing, the court should have construed them. The real issue was whether appellant knew Galbraith had made a verbal contract, and such issue, if requested by either party, should have been submitted, not what Galbraith communicated as to such matter, because, in considering whether appellant knew of the making of a verbal contract, the telephone conversation immediately prior to the making thereof was material to be considered, on account of the fact that Galbraith told appellant Baumberger was going to close a contract that day, which was notice to appellant that Baumberger wanted a contract. But, if there was error in submitting the issue, such error is not one requiring a reversal of the case.

[9] Assignment No. 7 complains of question 4, submitted at appellee's request; the objection urged in the proposition being that it submitted an issue already covered by issue No. 5, submitted at appellant's request. This objection should have been sustained, but the error is not one which requires a reversal. Rule 62a for Courts of Civil Appeals (149 S. W. x).

[10-12] Several assignments of error are directed at the sufficiency of the evidence to sustain the findings of the jury, and, in order to shorten this opinion, we will consider such assignments together. It is contended that the evidence is insufficient to sustain a finding that Galbraith and Baumberger both intended that the verbal contract made by them should be binding. Baumberger testified that nothing was said by Galbraith to the effect that the contract would have to be in writing; that Galbraith telephoned from Baumberger's office to appellant's Houston office, stating fully appellee's requirements as to contract, including facts that shipments must be over Galveston, Harrisburg & San Antonio Railway and in small cars, and stated that Baumberger was going to close a contract that day, and, unless they would meet the price of the Higgins Company, they would lose the business; that Galbraith then

told Baumberger either that he was instructed to close the contract or authorized to close it, and they did close such contract, and nothing was said by Galbraith about a written contract until several days later, when he stated that "they wanted it in writing." Appellants sometimes shipped fuel oil without a written agreement, and had sold the San Antonio Portland Cement Company, in which Baumberger was interested, fuel oil upon one occasion without a written contract, but it was an order for a certain number of cars to be delivered at once. We conclude that the evidence is sufficient to support a finding that both Galbraith and Baumberger intended the contract to take effect at once. The next question is whether the evidence sustains a finding that one car of oil was shipped by appellant in recognition of the verbal contract so made. When Dodge ordered the traffic department to ship a small car every three days until further notice, he had before him Galbraith's telegram and letter of July 5th, in both of which he stated that he had closed with Baumberger. The letter, aided by its reference to a preceding one, contained a full statement of the terms of the contract proposed by Baumberger. The cars were ordered shipped, and one was shipped on July 6th. It appears that on July 6th Galbraith wrote another letter to Straughan, to whom Dodge had passed the matter of correspondence and communication with Galbraith concerning this matter, mentioning a telephone conversation with Straughan, and it is inferable from said letter that some question was raised about shipment only in small cars, and that Baumberger agreed to take an occasional large car. It appears that on the 7th Dodge concluded not to put in the written contract the terms proposed by Baumberger, and left out two items, one as to size of cars, and the other as to road over which shipments were to be made. It appears that by shipping the car after full knowledge of the terms proposed by Baumberger appellant accepted such terms, and the refusal on the 7th to put same in the written contract was an after thought. But was the shipment made in recognition of the verbal contract made between Baumberger and Galbraith? It could not be in recognition of such a contract unless Dodge had notice of the existence of such contract. Now, what did Dodge know at that time? He admits that Straughan had authority to receive the communications by mail and telegraph sent by Galbraith, and to make the answers which he made, and had authority to communicate by telephone with Galbraith concerning the matter. In fact, this particular transaction had been passed up to Straughan by Dodge; but Dodge testified Straughan had no authority to authorize Galbraith to make a binding contract. It seems clear, however, that he did have authority to receive notice of the

fact, disclosed in the telephone conversation, that Baumberger wanted to close a contract that day, and appellant is chargeable with such notice. Dodge testified the order was issued to the traffic department to ship one car every three days until further notice, and, speaking of such order, said: "That was shipped on the 6th when we thought we had a contract from Galbraith." Upon being asked how he came to think they had a contract from Galbraith unless he had authority he said, "From Galbraith's instructions," and stated again that Galbraith had no authority, but, after some explanations, stated, "I said awhile ago when we shipped out I thought Galbraith had closed an authorized contract in San Antonio." Upon being again pressed on the question of Galbraith's authority, he explained: "I mean by 'closing a contract' to secure the contract of the purchaser if the contract was sent him; that is all that was necessary to close it if the contract was sent to him. I don't recall whether contract was in San Antonio on July 6, 1910."

From this testimony it will be seen that Dodge knew some kind of a contract had been closed by Galbraith, and, in addition, having notice of the fact that Baumberger wanted to close a contract that day, we think the telegram and letter must necessarily be construed as a notice that Galbraith had closed a contract with Baumberger, and the letter shows that the contract was not in writing, because Dodge is requested to prepare and send written contracts. Galbraith said in the letter and telegram that he had closed with Baumberger. He had stated that Baumberger wanted to close a contract that day. How can this be construed to mean that Galbraith had merely procured an offer from Baumberger of a certain price and certain terms to be approved by Dodge, before a contract would be created? If Galbraith had no authority to make the contract, and Dodge did not wish to recognize or ratify the same, it seems that after receiving such notice of the action taken by Galbraith he should have taken a hand in the matter and notified Baumberger that the contract had to be in writing and approved by him, so that, if Baumberger did not care to delay further, he could have terminated the negotiations. It reasonably appears that, on account of the urgency of the occasion and the attractiveness of the future business of Baumberger as depicted by Galbraith, Dodge was willing to recognize, and did recognize, the verbal contract made by Galbraith and order shipments pursuant thereto, being satisfied with the terms, as he made no complaint, and being contented with the assurance that the contract would, when reduced to writing, be signed by Baumberger. As to the question whether Galbraith, in fact, had authority to make a binding verbal contract, we need only say that

the recognition of such contract, and shipment of oil pursuant thereto, makes the contract binding upon appellant, and it is immaterial whether authority existed to make such contract, but we conclude that the evidence is insufficient to· sustain a finding to that effect.

The eighth, ninth, eleventh, twelfth and thirteenth assignments are overruled. The tenth is sustained.

[13] Appellee by cross-assignment contends it should have been allowed $400 for loss of profits while the plant was closed for want of fuel oil. The issues submitted on this phase did not call for sufficient information to determine the number of days the plant was closed nor the amount of cement it would have produced during the time, but merely called for a finding as to the market value of cement during said time and the expense of running the plant. The answer as to market value was "$2.25," without stating what quantity was referred to. The court declined to grant appellee's motion for judgment upon such findings, and appellee contends we should refer to the undisputed evidence for the purpose of completing and explaining the verdict. The verdict cannot be aided by reference to the evidence. See Houston Packing Co. v. Griffith, 164 S. W. 431, decided by this court on February 25, 1914, for authorities. Appellee contends that rule does not apply when a case is submitted upon special issues. The law makes no distinction, except that upon appeal an issue not submitted and not requested by a party to the cause shall be deemed as found by the court in such manner as to support the judgment, provided there be evidence to sustain such a finding. Article 1331, Sayles' Civil Stats. 1897. This provision cannot avail appellee, because it has no judgment to be aided by indulging presumptions. Fant v. Sullivan, 152 S. W. 522. Nor does it authorize the court to add anything to a finding made upon an issue submitted.

The cross-assignment is also overruled, upon the ground that said damages were barred by limitation upon the same grounds as the claim for wages paid employés.

The judgment is reversed, and judgment here rendered that appellant recover of appellee the sum of $392.78, adjudged by the trial court as due on appellant's demand, less the sum of $237.95, adjudged to be due appellee upon its cross-action ·because of the difference in the contract price of oil and the market value, leaving the sum of $154.83, for which judgment is entered in favor of appellant, the same to bear interest from the date of the trial court's judgment at the rate of 6 per cent. per annum.

CARL, J., entered his disqualification, and did not sit in this case.